## HATTON *v.* CASEY.

[No. 14,187. Filed November 18, 1931.]

*E. Burleigh Davidson*, for appellant.

*Vaugh & Vaughan* and *Charles D. Lesley*, for appellee.

BRIDWELL, P. J.—Appellee brought this action against appellant to recover the sum of $99.25, alleged to be due for certain merchandise sold and delivered to appellant and consisting of 56 "Advertoshare Checkerboards." Appellant filed an answer in two paragraphs to the complaint, the first paragraph being a general denial, the second admitting the purchase and receipt of the merchandise and the amount of the contract price therefor, but seeking to avoid liability on the contract by asserting that said "Advertoshare Checkerboards" were gambling devices and that he had purchased same in ignorance of their real nature, and that, for the reason that said boards were gambling devices, his contract of purchase was void at law and unenforceable; that the consideration for the promise to pay for said boards was and is unlawful and that said contract and agreement to purchase is without lawful consideration. A reply in general denial to the second paragraph of answer closed the issues. The cause was submitted to the court for trial and there was a finding and judgment for appellee for the sum of $99.25 and costs.

Appellant filed his motion for a new trial upon the grounds that the finding of the court is not sustained by sufficient evidence and that the finding of the court is contrary to law. This motion was overruled, and appellant duly excepted and perfected this appeal, assigning as error the overruling of his motion for a new trial.

The evidence in this case discloses that, during the month of April, 1930, appellee was the owner and jobber of certain merchandise known as "Advertoshare Checkerboards,' and that, during said month, a sale of a number of said boards was made by appellee to appellant. Certain letters in evidence disclosed that appellant had written appellee for price, size and information concerning these boards and, having received such in-

formation, appellant, at a later date, wrote requesting appellee to ship certain designated boards. Upon receiving this order, the items ordered (which consisted of 25-200, 25-300 and 6-600 size Advertoshare Boards) were packed, invoiced and shipped by express, addressed to appellant at Lafayette, Indiana. Appellant received this shipment of goods, but, upon inspecting the same, informed appellee by letter that, as such checkerboards were gambling devices, he would have no use for them, and requested that appellee inform him where to ship such boards in sending them back. The goods have never been returned to appellee, nor has the purchase price been paid.

Appellee's Exhibits 7 and 8 were admitted in evidence and are exact and correct photographic reproductions of the front and rear sides of the so-called "Advertoshare Checkerboards" as sold to the appellant. These boards, as they appear from the exhibits introduced in evidence, have printed thereon as a part thereof a checkerboard, its spaces numbered from 1 to 32 consecutively and the lower part of such boards is perforated, each board having 600 holes. The evidence is that in each of these holes there is a small slip of folded paper which bears the name of Polly, Clara, Julia, Flora, Alice or Nancy; that there are 100 of each of these names to each board of 600 holes and each 100 slips of the same name have the same placement of checkers on the numbered checkerboard; that each name is an arbitrary one given a "set up," which "set up" is a partially played game of checkers.

If these boards be used for the purpose of holding a contest between checker players, then any person desiring to play pays an entrance fee of 10 cents which is the only requirement necessary to play the game, and has the right to punch a name from the board. Upon

receiving such name, the player, by instructions which are attached to the board, is instructed to place certain checkers of one color upon certain designated numbered spaces on the numbered checkerboard, and checkers of the opposing color on other designated spaces, thereby getting what is called a "set up." That, from this step, the player who plays both sets of checkers is instructed to move a black checker first, always playing the black to win over the white, not in the manner of give away. That each problem may be solved with a greater or lesser number of moves, but the solution having the least number of moves would be considered the better solution; that the merchant or party owning the board has a "key" to the better solution, and may offer a prize or prizes for any or all solutions, fixing his own conditions as to the best, quickest, neatest, etc., of any kind and all problems.

The testimony of the appellee's salesman, the only witness called in appellee's behalf, is that a suggestive prize list is shipped with the boards, but not affixed thereto, and that it is optional with the dealer to arrange the kind and number of the prizes and that he might offer cash prizes; that the prizes suggested are a $3 box of chocolates for the first prize, a $2 box for the second prize, a $1 box for the third and for the fourth prize, a $2 box for the last sale within two sections of the board, and a $3 box for the last sale on the board; that all the little tickets that are in the holes in the board have a distinguishing mark, each having both a serial and a problem number, and that there is nothing to prevent a merchant from making a list picking out certain numbers and offering prizes for the numbers so selected when punched from the board. This witness also testified that prizes might be awarded by the dealer to any customer who could solve the problem

within a certain length of time, and that prizes offered for the last sale within two sections, and for the last sale on the board, were not given on the solution of any problem within the board.

Appellee's Exhibit 9 introduced in evidence is a copy of instructions for the use of the board, forwarded by appellee to appellant, with the merchandise sold. In such instructions, it is stated that the merchant holds the key to the better solution of the various set up checker games and that he may offer a prize or prizes for any or all solutions of any or all problems, fixing his own conditions.

Exhibit 10 admitted in evidence consists of instructions to the dealer "pointing out the best forced play necessary to meet the term of problems within the board."

No conflict in the evidence exists, and the question to be determined is as to whether the merchandise sold and described in the evidence is a gambling device, the use of which would be contrary to law and against public policy.

Section 2690 Burns 1926, Acts 1905 p. 718, ch. 169, §565, provides as follows: "Whoever keeps or exhibits for gain, or to win or gain money or other property, any gaming table . . . or any gambling apparatus, device, table or machine of any kind or description, under any denomination or name whatever . . . or allows the same to be used for any such purpose, shall, on conviction be fined," etc.

If these boards are so designed that an unlawful use is contemplated and will ensue unless checked, then illegality of consideration may be asserted and is available as a defense, as the law will not assist in enforcing the contract, but will leave the parties in the situation in which they place themselves.

*Terre Haute Brewing Co.* v. *Hartman* (1898), 19 Ind. App. 596, 49 N. E. 864; *Hutchins* v. *Weldin* (1888), 114 Ind. 80, 15 N. E. 804; *Barnhart* v. *Goldstein* (1901), 27 Ind. App. 101, 59 N. E. 1067.

It is not asserted or claimed that the boards in question are manufactured and sold upon the market in order that persons interested in the game of checkers may purchase a problem presented by a certain "set up" in a partially played game of checkers, together with the best-known solution of a particular "set up," with the purpose in view of finishing the game and determining if their skill be such as to solve the problem in the best possible way as predetermined by the expert presenting the problem. On the contrary, it affirmatively appears from the evidence that said boards are sold with the suggestion from the seller that prizes be offered as a merchant may see fit, either for any or all solutions or for the best solutions of any of the problems, and such prizes may consist of candy, of goods that are shop worn and unsalable, of cash, or of any article of merchandise as the purchasing merchant may determine. If the merchant follows this suggestion and holds a contest for checker players, then any person desiring to enter the contest pays 10 cents and has the privilege of punching a slip of paper from the board and playing a solitaire game of checkers, reporting to the merchant his solution of the problem punched from the board, such solution to be considered in competition with solutions offered by 99 others who likewise engage in any such contest and have punched the same problem, the party having the best solution winning a prize. To operate the board in this manner would require much time and effort on the part of the merchant. He must keep a record of the various moves of each individual player, check each against the other, and eventually de-

termine which one of the players has presented the best solution of the particular problem in the solution of which they have been engaged.

Appellee calls the device a checkerboard. The evidence shows it to be a punch board as well, one containing 600 holes, in each of which is sealed a small piece of paper and each piece has a number distinguishing it from all others in the board. The fact that a checker board square is printed on each board and that instructions are printed thereon, or attached thereto, showing how any person desiring to do so may, by payment of an entrance fee, play a solitaire game of checkers and present his solution upon completion for competition with other solutions presented by other players, seems to us only an incidental use to which the boards may be put. The quick, easy and attractive way to operate the boards would be for the person operating it to make out and exhibit a list of prizes that would be won by the players lucky enough to punch out a number that was posted to win a prize. The boards are of such design and character that we find from Exhibit 9 that the seller deemed it necessary, or at least desirable, to warn any purchaser that such boards are sold with the understanding that same will not be used illegally, as appears from the following admonition appearing as a part of said exhibit, to wit: "The patentee of this board and the distributors or others furnishing it to the merchants or others, sell it with the distinct agreement and express condition that it shall not be used for gaming, betting, lottery or other purpose prevented by law." If this is a legitimate article of commerce, why the warning? To hold that this device is merely one whereby a merchant or other person may charge an entrance fee for the privilege of engaging in a contest where the winner will be awarded a prize for

skill would be to hold that to be true, which our better judgment and common sense tells us is not true.

It may be conceded that the game of checkers is a game of skill, but we cannot believe that these boards are sold and placed upon the market for the purpose of furnishing a means whereby a merchant or any other person may hold a contest wherein checker players will compete for a prize to the winner. It lacks the elements of a legitimate business enterprise. The possible use of the device as a checker board is a mere subterfuge. Its real nature cannot be so disguised. It is a "punch board," so designed that it is practically certain to be used for the selling of chances to win prizes such as the operator of the board may decide to offer to induce the public to take the chance of winning a prize, if they punch from the board a lucky number.

The purpose of the statute against gaming devices of any kind or description, and the evident intent of the Legislature in passing it, was to remove as far as possible the temptation for gambling and prevent the evils arising therefrom. The checkerboard feature of this device does not purge it of its vicious character as a punch board. The only practical use to which it can be put is to operate it as a game of chance. It is certainly so designed as to aid and encourage gambling. After considering the evidence, including a careful scrutiny of the exhibits forming a part thereof, we conclude that the so-called "Advertoshare Checkerboard" is a gaming device and such as is meant to be barred from use in this state by the statute to which reference has heretofore been made. It follows that the finding of the court is contrary to law and the motion for a new trial should have been sustained, and the court below is instructed to do so.

Judgment reversed.